**TAHOE–SIERRA PRESERVATION COUNCIL, INC., a California non-profit corporation and membership organization; Joseph R. Abrahamson and Charlene Z. Abrahamson, as Co-Trustees of the Joseph R. Abrahamson and Charlene Z. Abrahamson Family Trust; Jane S. Akdoruk; Jesse Aldatz, Jr.; Hugh C. Alexander; Raymond D. Allen, as Trustee of the Allen 1989 Revocable Trust; Gordon Alley; Bruno Alpi; Ernest Arnold; William L. Asay; Edith B. Asay; Nicholas D. Ba-**

---

dami; Alma Barnes Estate, by Linda M. Nelson and E. Marvin Jacobsen, Executors; Ernest A. Barron; Consuelo S. Barron; Tasos Belias; Erika Belias; Lawrence G. Bourne; Ricky Anthony Briganti; Anthony Richard Briganti; Alice Brouss, aka Alice Price; Lance R. Burket; Charles Donald Carr; Lonne Jean Carr; Robert Steven Carson; Richard John Charshafian; Nicole Charshafian; Albert S.C. Chong; Dorothy Mai Cook; Joseph Corege, Jr., as Co–Trustee of the Joseph Corege, Jr. and Helen Joan Corege Revocable Living Trust dated 1/13/92; Helen Joan Corege, as Co–Trustee of the Joseph Corege, Jr. and Helen Joan Corege Revocable Living Trust dated 1/13/92; Lind B. Cornett; Barbara Riordan Cornett; Carlton E. Crall; Anne T. Crall; Harold C.J. Cruze; Randi Cruze; Anne M. Dayne; Edmund J. De Martini; Loring A. De Martini; Francine De Martini; Gavin Deane; Christa Deane; Robert Delgadillo; Jess R. Detevis; Diane Detevis; Valzora G. Draper; Warren B. Eads; Cheri Eads; Louise B. Ebeling, aka Louise B. Geraci; Kenneth W. Eberle; Betty L. Eberle; John Frederick Ehlers; Mary Patricia Ehlers; Elmer Eldon; Betty C. Eldon; Davy K. Engle, as Co–Trustee of the Engle Family Living Trust of 8/3/88; Merna M. Engle, as Co–Trustee of the Engle Family Living Trust of 8/3/88; Robert C. Engstrand; Martha V. Engstrand; Edith Epstein; George L. Farinsky; Barbara J. Farinsky, as Co–Trustee of the Farinsky 1992 Trust; David V. Fetters, as Co–Trustee of the Fetters 1995 Trust; Phyllis A. Fetters, as Co–Trustee of the Fetters 1995 Trust; Albert A. Fischer and Jane M. Fischer, as Co–Trustees of the Albert A. Fischer and Jane M. Fischer Trust; Nolan Neil Fong; Lillian Fong; Laura E. Garcia; Salvatore Geraci; Chris Gerhardt; Leona Gerhardt; Earnest O. Germann; Virgine M. Germann; Constantine M. Glafkides; Thomas A. Godley; Kathleen L. Godley; Robert L. Godley; Steven Gourley; Charles E. Grant; Donald D. Gregory; Michael Griffin; Gayle Griffin; Giannotti Salvatore; David G. Gruber, as the Gruber Family Partner; Lydia Gruber, as the Gruber Family Partner; James S. Hahn; Betty J. Hahn; Estel Randolyn Hal, aka Estel Randolyn Wiessen; James F. Hamm; Norma P. Hamm; Pamela Hand; The Estate Of Wilson L. Harrell, Charlene E. Harrell as Executrix; Joichi Hashimoto, as Co–Trustee of the Hashimoto Living Trust; Fumiko Morita Hashimoto, as Co–Trustee of the Hashimoto Living Trust; Dana L. Hatch; Melton A. Hatch; Oliver M. Henrikson; Carolyn G. Henrikson; Donald I. Hitt; C.E. Hoffman; Pamela Hoffman; Craig L. Howe; S. Wayne Hughes; William D. Hude; Harry Ichiuji; Hideko Ichiuji; Tadashi Kato; Toshie Kato; Yoshiko Edith Ichiuji; Paul T. Ichiuji; Sumi Ichiuji; Gerald E. Johnson; Anne L. Johnson; Richard Merriman Johnson; Frances R. Keener; Dale Chow King; Janine Klassen; Karoline Kassen; Herbert H. Knoop; Maj–Britt K. Knoop; Michael Koll, as Co–Trustee of the Koll Revocable Trust; Jane Koll, as Co–Trustee of the Koll Revocable Trust; Albert J. Koolhof, Jr. and Rose N. Koolhof, as Co–Trustees of the Albert J. Koolhof, Jr. and Rose N. Koolhof Family Trust dated 4/22/96; George T. La Fortune; Adolph P. Landucci; Peggy E. Landucci; Don L. Langston; Josephine M. Langston; Jed K. Lea; C.J. Schoonenberg; James D. Leach, as Trustee of the Leach Bypass Trust dated 1/23/95; Lawrence W. Leary, as Trustee of the Lawrence W. Leary Family

Trust dated 4/22/99; Michael Ledesma; Carol L. Ledesma; Robert L. Lee; Barbara A. Lee; Geraldine Lencioni, as Trustee of the Geraldine H. Lencioni Trust; Josephine Lomascola; Henry G. Louie; Louise Louie; Richard Loverne; John Terzic; Johnnie G. Low, as Co–Trustee of the Michael Stephen Low Revocable Trust of 6/22/92; Karin Low, as Co–Trustee of the Michael Stephen Low Revocable Trust of 6/22/92; Halsey H. Lyon; Lawrence J. Callan; Michele Callan; Ian D. Macgregor; Eusebio S. Manaois; Betty Manaois; Nina Martorella; Joseph Cracchiolo; Randall Ray Mccollough; Frances Marie Mccollough; Hall B. Mcelree; Georgetter B. Mcelree; Alma C. Meehan; Jose A. Mendoza; Theresa Mendoza; Robert G. Mensching, As Co–Trustee of the Mensching Trust U/A 6/1/82; Sally A. Mensching, as Co–Trustee of the Mensching Trust U/A 6/1/82; Perry L. Metzger; Carline Metzger; Kenneth R. Metzger; Aboelkhair Saleh Mikhail; Aziza Aboelkhair Mikhail; John M. Milrot; Dorothy H. Milrot; Arthur A. Montero; Daniel P. Moradin; Dana More; Doris More Trust, Aka Dana More; Netdocs, Inc., Aka Voip.Net; Theodore James Nicholas, Sr.; Ning Family Trust, aka Robert Y. Ning, aka Mary Jane Ning; Northshore, Inc., a Nevada corporation; J. Evette Osslund, aka Osslund Trust; Raymond R. Overholt; Joanne Overholt; Marjorie Ruth Parker, as Trustee of the Marjorie R. Parker Living Trust; Jewel Dean Parks, as Trustee of the Jewel Parks Family Trust; Robert Patterson, as Trustee of the Robert Patterson Trust; Michael H. Payne; Judith A. Payne; Augustine Ronald Pepi; Shirley Elizabeth Pepi; Gladys C. Percy; Albert J. Perini; Ann P. Perini; John B. Poppe; Joyce R. Poppe; James W. Porter, as Trustee of the Porter Family Trust dated 6/25/91; Gloria S. Price; Barbara Purrington; Robert J. Raab, Jr.; Francis Dee Roberge; Lillian Dee Roberge; Hugh E. Robertson, as Trustees of the Brotherhood Trust U/D/T dated 4/27/92; Beverly J. Robertson, as Trustees of the Brotherhood Trust U/D/T dated 4/27/92; George R. Robinson; John J. Roboti; Marion P. Roboti; Raymond R. Robson, Jr.; Gerald K. Roskelley, Co–Trustee of the Roskelley Family Revocable Trust dated 2/11/97; Faye M. Roskelley, as Co–Trustee of the Roskelley Family Revocable Trust dated 2/11/97; Tony Rothrock, Jr.; Carol J. Rothrock; Mark M. Rusin, as Co–Trustee of the Rusin Family Trust dated 12/78; Joan L. Rusin, as Co–Trustee of the Rusin Family Trust dated 12/78; Pedro C. Salcedo; Audrey F. Salcedo; John A. Schaller, as Co–Trustee of the Schaller Trust; Edwina M. Schaller, as Co–Trustee of the Schaller Trust; Richard L. Schlotzhauer; Marsha R. Schlotzhauer; Robert K. Schulz; Patricia A. Schulz; William Schumacher; Robert D. Seifert; Vaughn D. Shell, as Trustee of the Shell Family Revocable Trust dated 2/21/96; Laverne Jeanene Shell, as Trustee of the Shell Family Revocable Trust dated 2/21/96; Daryl Shoemaker; Donna Slagle; Lorna Sapp; J. Rockwell Smith; Patricia Smith; Edward K. Stearns; Donald P. Swan; Arshak Tchobanian, as Trustee of the Arshak Tchobanian and Delilah Tchobanian Living Trust; Delilah Tchobanian, as Trustee of the Arshak Tchobanian and Delilah Tchobanian Living Trust; Nicholas Toth, as Trustee of the Nicholas Toth Trust; Donald Tow; Marie Tow; Frank W. Trabucco, as Co–Trustee of the Frank W. Trabucco and Mary S. Trabucco Living Trust dated

12/18/92; Mary S. Trabucco, as Co–Trustee of the Frank W. Trabucco and Mary S. Trabucco Living Trust dated 12/18/92; Donald Paul Turner; Doris A. Turner; Adrianus I. Van Dalen; Renate Van Dalen; Elaine Van Fossen; Derek S. Vanacore; Kim Vanacore; Veijo V. Varnela; Elizabeth J. Etienne; Richard G. Ventresco; Darleen P. Ventresco; Dennis W. Voos and Naomi J. Voos, as Co–Trustees of the Dennis Voos Family Trust; Aaron J. White; Sheila J. White; Woodrow H. Wilson; Barbara C. Wilson; Jane G. Wohletz; Leonard R. Wohletz, Jr., Plaintiffs–Appellants,

v.

TAHOE REGIONAL PLANNING AGENCY; State of Nevada; State of California, Defendants–Appellees.

No. 00–16660.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 18, 2002.

Filed Feb. 28, 2003.

Lawrence L. Hoffman, Tahoe City, CA, for the plaintiffs-appellants.

E. Clement Shute, Jr., Fran Layton, Shute, Mihaly & Weinberger LLP, San Francisco, CA; and Daniel L. Siegel, Supervising Deputy Attorney General, State of California, Sacramento, California, for the defendants-appellees.

Before REINHARDT, HAWKINS, and THOMAS, Circuit Judges.

## OPINION

REINHARDT, Circuit Judge.

Since 1984, an association of property owners known as the Tahoe–Sierra Preservation Council ("Association") has been engaged in litigation challenging the regulatory program that protects one of the most pristine environmental habitats on the planet. The Association has fought vigorously for the interests of owners of property in the Lake Tahoe Basin ("Basin"), an aesthetically and ecologically cherished region straddling the California–Nevada border. The extensive litigation between the Association and the Basin's regulatory body, the Tahoe Regional Planning Agency ("Agency"), has thus far generated ten published opinions, four from this court alone.

The current action is a challenge to provisions of the Agency's 1987 Regional Plan ("1987 Plan"). In 2000, we dismissed similar claims brought by the Association pursuant to the applicable statutes of limitations. Because the current claims—brought by the same lead plaintiff, acting on behalf of organizational members with the same interests—stem from the same transactional nucleus of facts, we find that the instant suit is barred by the doctrine of res judicata. We therefore affirm.

## I. FACTUAL BACKGROUND

"Lake Tahoe, the dominant presence in this litigation, is a remarkable alpine lake located in the northern Sierra Nevada mountains" and spanning the California–Nevada border. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 34 F.Supp.2d 1226, 1230 (D.Nev.1999)[hereinafter *Tahoe IV Trial* ], *aff'd in part and rev'd in part*, 216 F.3d 764 (9th Cir.2000) [hereinafter *Tahoe IV Appeal* ]. In part, Lake Tahoe is so remarkable because it is so startlingly clear. Its clarity is a result of the fact that Lake Tahoe has been, for most of its history, "oligotrophic"—that is, very low in dissolved nutrients.

Since mid-century, however, Lake Tahoe has been undergoing "eutrophication," a process by which its nutrient content increases dramatically due to nitrogen- and phosphorusrich soil that is washed into the lake. These nutrients encourage the growth of algae, which renders the formerly clear blue water green and increasingly opaque. Moreover, the algae depletes oxygen in the water, jeopardizing the survival of fish and other animal life.

The dramatic increase in Lake Tahoe's nutrient levels has been caused by the rapid development of environmentally sensitive land in the Basin. The land in the Basin drains into the lake, and artificial disturbance of the land—through the destruction of vegetation, the creation of surfaces (roads, houses) impervious to rain, and other means—greatly increases the erosion of soil and consequent flow of nutrients into the lake. The degree to which the development of any particular parcel of land contributes to nutrient flow depends on various characteristics of the parcel; in general, the development of steeper land leads to more environmental damage, because steeper land is susceptible to more rapid soil erosion. Other property characteristics may also cause disproportionate impact: for example, certain areas near streams and other wetlands, known as Stream Environment Zones ("SEZs"), act as filters for much of the rainfall runoff, and disturbance of these lands can rapidly discharge stored nutrients into the lake as well as prevent the beneficial filtration process from taking place.

In 1969, to regulate development and ensure the preservation of the environmentally precious Basin, the Agency was formed pursuant to a Compact approved by the States of California and Nevada and the United States Congress. *See Tahoe IV Trial*, 34 F.Supp.2d at 1232; 1967 Cal. Stat. ch. 1589, p. 3804 § 1, *amended by* 1968 Cal. Stat. ch. 988, p. 1900 § 1; 1968 Nev. Stat. 4; Act of Dec. 18, 1969, Pub.L. No. 91–148, 83 Stat. 360. The Agency adopted a land taxonomy scheme known as the "Bailey system," which classified areas of the Basin into one of several land capability districts, from District 1 (the most environmentally sensitive) to District 7 (the least sensitive). Land capability districts 1 through 3—the steepest lands in the basin—were denominated "high hazard" or "sensitive" lands. Due to their unique environmental fragility, the Bailey system classified "stream environment zones" ("SEZs") separately, as a special subcategory of "sensitive" lands. The Agency then adopted recommendations for the amount of development that each district would be allowed to sustain.[1]

Although the Agency's regulatory scheme seemed facially sound, it was diluted in its implementation by numerous ex-

---

**1.** Because this case concerns the Agency's 1987 Plan, we present the factual background for events prior to 1987 in cursory fashion only. For a more comprehensive account of the region, the regulations, and the litigation that the regulations have spawned, see *Tahoe IV Trial*, 34 F.Supp.2d at 1230–38.

ceptions permitting development on sensitive lands. Over the next decade, "[i]t became evident that the environment was continuing to decline, and that the 1969 Compact was not strong enough to fix the problem." *Tahoe IV Trial,* 34 F.Supp.2d at 1233. After California imposed stricter regulations on its own territory, the Compact was amended in 1980 to increase the level of environmental protection for the Basin as a whole. 1980 Cal. Stat. ch. 872, p. 2710 § 2 (codified as amended at CAL. GOV'T CODE § 66801); 1980 Nev. Stat. 1 (codified at NEV. REV. STAT. 277.200); Act of Dec. 19, 1980, Pub.L. No. 96–551, 94 Stat. 3233. This new Compact restructured the Agency and required it to review all proposed land use projects, impose temporary restrictions on development, and establish a new regional environmental preservation plan. The Agency then adopted ordinances regulating development in the Basin pending the approval of this new plan.[2]

On April 26, 1984, the Agency adopted the new plan. Immediately, California challenged the plan in federal court, and on June 15, the court granted a preliminary injunction prohibiting the Agency from issuing any development permits in the Basin. *See People v. Tahoe Reg'l Planning Agency,* 766 F.2d 1308, 1316 (9th Cir.1985) (upholding the injunction).

## A. The 1987 Plan

On July 1, 1987, the Agency issued a completely revised regional plan—the principal subject of this lawsuit—and the injunction put in place by the California lawsuit was vacated. The 1987 Plan implemented a new land classification system named the Individual Parcel Evaluation System ("IPES"). *See Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 729–30, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (describing IPES). The Agency describes IPES as "an objective system that rates the relative environmental suitability of vacant residential parcels for building and other modifications." A multidisciplinary team of experts is responsible for assigning a given parcel an IPES score from 0 to 1150 based on enumerated criteria; a parcel with a higher score is environmentally more resilient, and can safely withstand more development. Each of the plaintiffs' parcels received an IPES score at some time in 1987, 1988, or 1989; no plaintiff currently challenges the accuracy of his IPES score.

For purposes of this litigation, the IPES score is relevant in its relation to the IPES Pass–Fail Line ("IPES Line"). Under the 1987 Plan, only those property owners with IPES scores *above* the IPES Line are eligible to submit an application for permission to develop their parcels. *See* TRPA CODE § 37.8.E (1987). The Agency then reviews the eligible applications, and selects 300 applicants per year from the entire Basin to receive a single-family building permit. An owner without one of

**2.** Among these ordinances was Ordinance 81–5, which was promulgated on June 25, 1981, and became effective on August 24, 1981. Ordinance 81–5 prohibited most development on "sensitive" lands—SEZs and areas classified under the Bailey system as Districts 1, 2, or 3. Limited exceptions were available for pre-approved single-family homes in Nevada, but due to California's stricter regulations, no such exceptions were available on similarly classified California territory.

On August 26, 1983, Resolution 83–21 eliminated the limited exceptions for single-family

Nevada homes formerly available under Ordinance 81–5; after August 26, all development was prohibited in SEZs and Districts 1, 2, and 3. Resolution 83–21 was promulgated in anticipation of a forthcoming new regional plan, and was to have remained in effect for only ninety days. However, the new regional plan was delayed, and the Agency's staff continued to abide by a complete development moratorium pending the plan even after the contemplated ninety days had elapsed.

these permits is not permitted to develop his property.[3]

The 1987 Plan also allows a property owner whose IPES score is within ten percent of the IPES Line to complete an Agency-approved water quality mitigation project or to pay a "mitigation fee." [4] Thereafter, the owner's IPES score may be raised above the IPES Line, enabling the owner to apply for one of the 300 annual development permits. *See* TRPA CODE § 37.2.I & app. J (1989).

## B. Moving the IPES Line

The IPES Line is not permanently fixed. Rather, if and when certain objective criteria are met, and the environmental status of the Basin as a whole becomes more secure, the IPES Line is lowered, permitting more development on individual parcels.

In December 1988, the Agency set the initial level of the IPES Line at 725 points, effective upon implementation of the IPES System on July 1, 1989. However, the 1987 Plan provides that the Agency must annually conduct a review of each county in the Basin and determine if the IPES Line shall be re-set according to a specified formula. Only if a particular county meets specified criteria does the Agency apply the formula to lower the IPES Line—and permit more development—for that county. One of the critical threshold criteria that must be satisfied before the Agency can lower the IPES Line is the "vacant lot equation," measuring the countywide proportion of sensitive parcels available for development. *See* TRPA CODE § 37.8.C(1)(e).[5] The vacant lot equation must drop to 20% in California counties and 33% in Nevada counties before the IPES Line is lowered. This means that before the IPES Line can be lowered in a California county, for example, 80% of the parcels designated as sensitive in 1986 must have been permanently protected from development. *Id.*

3. There is some dispute over whether the development plan treats SEZ properties differently in kind or differently in degree from other environmentally sensitive properties. The parties agree that SEZ properties receive an IPES score of zero. *See* TRPA CODE § 37.4.A(3), .B(3), .C (1988). The Association claims that SEZ properties are otherwise like all others in the Basin; if the IPES Line falls to zero, the Association believes that owners in SEZs would be eligible to apply for a development permit. The Agency, however, contends that regulations unconnected to the IPES system independently prohibit essentially all new development within a SEZ. *See* TRPA CODE § 20.4, .4.B (1989). Therefore, according to the Agency, owners of properties within a SEZ will still be prohibited from developing their parcels even if the IPES Line should one day drop to zero.

4. The fee is set at $672 per point that the property's IPES score falls short of the IPES Line. *See* TRPA CODE § 37.2.I & app. J (1989). Currently, for example, the maximum mitigation fee for a California property owner would be $48,384, because the IPES Line in California is now set at 725, the lowest IPES score within 10% of the IPES Line is 653 (or 72 points less than the level of the Line), and the fee would therefore be $672 per point multiplied by 72 points. Mitigation fees are to be pooled and used by the Agency to fund local government water quality projects elsewhere in the area.

5. The vacant lot equation is designed to control the overall level of development on environmentally sensitive lands within a county. The vacant lot equation is simply the proportion of the sensitive lands in the county that are not permanently protected from development. *See* TRPA CODE § 37.8.C(1)(e). (The "equation" is calculated by dividing the number of environmentally sensitive parcels currently available to be developed by the number of parcels originally identified as sensitive in 1986.) The proportion of unprotected parcels drops as more and more owners agree to relinquish all rights to develop their property; these owners may be compensated for such agreements by federal, state, or private "buy-back" programs.

By 1990, the Agency had surveyed the land within the Basin, and had calculated the "vacant lot equation" in each county. The result was roughly consistent with early estimates in Nevada, but higher than initially predicted in California.[6]

Thereafter, on an annual basis, the Agency recalculated the "vacant lot equation," made the additional findings mandated by the Plan, and determined whether it was required to adjust the IPES Line.

In Nevada, no-development agreements on sensitive parcels caused the vacant lot equation to reach 33% in 1993, which permitted the Agency to lower the IPES Line, which in turn permitted more development. After a public hearing, on January 27, 1999, the Agency's governing board ("Board") set the IPES Line at 325 in Washoe County, Nevada, and at 639 in Douglas County, Nevada. On December 15, 1999, after another public hearing, the Board again set the IPES Line at 325 in

Washoe County, Nevada, but moved the IPES Line to 606 in Douglas County, Nevada. The IPES Line remains at these limits today, leaving only a relatively small number of environmentally sensitive lots in Nevada below the threshold necessary to apply for development permits.

In California, however, enough sensitive parcels remain available for development that the vacant lot equation has not yet reached its California trigger level; the equation has not reached the 20% required by the Agency Code before the IPES Line will move. At its January 27, 1999, meeting, therefore, the Board held the IPES Line at 725 for both California counties in the Basin. On December 15, 1999, the Board again confirmed that the IPES Line would remain at 725. The IPES Line remains at 725 today in both California counties.

## II. PROCEDURAL BACKGROUND

Litigation involving the same material set of facts is now on its fifth journey through the federal court system.[7] This

---

**6.** There is some contention regarding representations allegedly made with respect to the calculation of the vacant lot equation and movement of the IPES Line. The Association plaintiffs claim that in 1986, the Agency represented that the IPES Line would drop swiftly, "so that over a 5–7 year period of time *all* lots would be eligible to be built upon"—that is, that the IPES Line would drop to zero. The plaintiffs further allege that "sometime in 1990, ... the [Agency] adopted a significant revision of the criteria originally adopted for annual adjustment of the [IPES] Line." The revision allegedly caused a substantial decrease in the projected rate of the drop.

This "revision" refers to a dispute over the numerator of the vacant lot equation—the number of environmentally sensitive parcels available to be developed in each county. The higher the numerator, the more environmentally sensitive parcels must be protected from development before the IPES Line can be adjusted, and the more slowly the IPES Line is likely to drop. The Association alleges that the Agency originally put forth a low

numerator, suggesting rapid movement, and then increased the numerator in 1990, revealing the more substantial nature of the likely delay.

The Agency disputes this characterization. Specifically, the Agency claims that even if the initial estimates were inaccurate, "the *criteria* for movement of the IPES Line are clearly set forth in the 1987 Regional Plan and have not since been amended" (emphasis added). *See, e.g.,* TRPA CODE § 37.8.C (1987).

Neither party disputes that the criteria for calculating the vacant lot equation, and the initial calculation of the equation itself, were both fixed, at the latest, by 1990.

**7.** *See, e.g., TSPC v. TRPA,* 611 F.Supp. 110 (D.Nev.1985); *TSPC v. TRPA,* 638 F.Supp. 126 (D.Nev.1986); *TSPC v. TRPA,* 911 F.2d 1331 (9th Cir.1990) [hereinafter *Tahoe I Appeal* ], *cert. denied* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 459 (1991); *TSPC v. TRPA,* 938 F.2d 153 (9th Cir.1991) [hereinafter *Tahoe II Appeal* ]; *TSPC v. TRPA,* 808 F.Supp. 1484 (D.Nev.1992); *TSPC v. TRPA,* 34 F.3d

extensive procedural history need not be repeated in full. Instead, we review here only that history which is necessary for our resolution of the present appeal.

## A. The Prior Litigation

The complaints in the various actions that have been filed encompass four different periods: **Period I,** from August 24, 1981, until August 26, 1983, when Ordinance 81–5 banned development in the Basin with a few exceptions for Nevada single-family buildings; **Period II,** from August 27, 1983, until April 25, 1984, when Resolution 83–21 banned all development in the Basin; **Period III,** from April 26, 1984, until June 30, 1987, when the 1984 Regional Plan was in effect; and **Period IV,** from July 1, 1987, until the present, since the 1987 Regional Plan became effective.

The initial litigation began on June 25, 1984, when the plaintiff Association and various individual property-owner members filed a complaint in the U.S. District Court for the District of Nevada on behalf of Nevada property owners and a complaint in the U.S. District Court for the Eastern District of California on behalf of California property owners. The complaints alleged that the development moratoria imposed by the Agency regulations in Periods I, II, and III constituted violations of the Takings Clause, the Due Process Clause, the Equal Protection Clause, and the Contracts Clause, and demanded declaratory, monetary, and injunctive relief.

Over the next seven years, various portions of the claims were dismissed. After

this court reviewed the case for the second time in 1991, the only claims remaining were for damages from the Agency to compensate for temporary takings in each of Periods I, II, and III. *See TSPC v. TRPA,* 611 F.Supp. 110 (D.Nev.1985); *TSPC v. TRPA,* 638 F.Supp. 126 (D.Nev. 1986); *Tahoe I Appeal,* 911 F.2d 1331; *Tahoe II Appeal,* 938 F.2d 153.

On October 28, 1991 (for Nevada plaintiffs), and March 17, 1992 (for California plaintiffs), the Association and its members filed amended complaints under 42 U.S.C. § 1983, alleging that the Agency's development moratoria violated the Takings Clause. In these amended complaints, the Association asserted for the first time takings claims covering Period IV, the period in which the 1987 Plan prohibited development for properties with scores below the IPES Line. Only these Period IV claims are at issue here.

The cases were consolidated in the District Court for the District of Nevada, which dismissed the Period IV claims as barred by the Compact's statute of limitations. The court first found that the facial takings claims relating to Period IV accrued when the 1987 Plan was adopted on July 1, 1987. *TSPC v. TRPA,* 808 F.Supp. 1484, 1491 (D.Nev.1992). Because these claims were not asserted until October 28, 1991, and March 17, 1992, when the complaints were amended,[8] the court—applying a 60–day limitations period from the Compact—concluded that the claims were time-barred, and dismissed them with prejudice. *Id.* at 1491–92.

753 (9th Cir.1994) [hereinafter *Tahoe III Appeal*], *amended by* 42 F.3d 1306 (9th Cir. 1994), *cert. denied,* 514 U.S. 1036, 115 S.Ct. 1401, 131 L.Ed.2d 288 (1995); *TSPC v. TRPA,* 992 F.Supp. 1218 (D.Nev.1998); *Tahoe IV Trial,* 34 F.Supp.2d 1226 (D.Nev.1999); *Tahoe IV Appeal,* 216 F.3d 764 (9th Cir.2000), *reh'g en banc denied,* 228 F.3d 998 (9th Cir.

2000); *TSPC v. TRPA,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

8. The court found that, due to the substantial differences between the 1987 Plan and the 1984 Plan, the amendments incorporating Period IV claims did not relate back to the original June 25, 1984, complaint.

For the next six years, the parties litigated the statute of limitations to be applied to the Period IV claims. *See Tahoe III Appeal,* 34 F.3d 753, *amended by* 42 F.3d 1306 (1994), *cert. denied,* 514 U.S. 1036, 115 S.Ct. 1401, 131 L.Ed.2d 288 (1995); *TSPC v. TRPA,* 992 F.Supp. 1218 (D.Nev.1998). Eventually, the district court concluded that the proper limitations period for the plaintiffs' § 1983 action was supplied by the state personal injury statutes—one year in California and two years in Nevada—and that the Agency had not waived its limitations defense. *TSPC v. TRPA,* 992 F.Supp. 1218 (D.Nev.1998). Because both the California and the Nevada statute of limitations would have barred complaints filed on October 28, 1991, and March 17, 1992, alleging the unconstitutionality of a July 1, 1987 Plan, the court dismissed all Period IV claims.

In *Tahoe IV Appeal,* we reviewed the district court's decision, and affirmed the statute of limitations finding. *Tahoe IV Appeal,* 216 F.3d 764, *reh'g en banc denied,* 228 F.3d 998 (9th Cir.2000), *aff'd on other grounds,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

## B. The Instant Action

The parties are now back before this court for a fifth round of litigation over the Agency's regulations. On January 7, 2000, the Association as well as 243 individual California plaintiffs and nine individual Nevada plaintiffs, all of whom are members of the Association (hereafter collectively referred to as "Association"), filed new complaints in the Eastern District of California and the District of Nevada, respectively, alleging violations of the Takings Clause and the Equal Protection Clause and seeking relief under 42 U.S.C. § 1983.[9] The plaintiffs assert that the

Agency's implementation of its 1987 Plan in Period IV effected an unconstitutional taking of property.

Specifically, the Association contends that the takings resulted from the Agency's alleged misrepresentations regarding the time period within which the IPES Line would drop, combined with its annual "refusal" to lower the IPES Line threshold to permit development of each parcel. That is, the Association contends that the takings were triggered by the allegedly improper January 27, 1999, and December 15, 1999, Agency decisions to maintain the existing level of the IPES Line, thus depriving the owners of property that remained below the Line of the value of that property. These decisions allegedly made clear that the plaintiffs would not be permitted to develop the property in the reasonably foreseeable future, contrary to the Agency's initial representations.

The plaintiffs assert that the development moratoria imposed by the Agency's regulatory scheme constitute categorical takings; or, in the alternative, that they are unconstitutional because they do not substantially advance legitimate state interests. Those plaintiffs within 10% of the IPES Line ("10% Plaintiffs"), for whom development applications may be conditioned on the successful pursuit of a mitigation project or the payment of a mitigation fee, more specifically protest the nexus between their conditional moratoria and the asserted state interests, under the "exactions" doctrine of takings law. The Association further challenges the Agency's *absolute* ban on development in SEZs as an unconstitutional taking. Finally, the Association challenges the alleged decision to lower the IPES Line more rapidly on the Nevada side than on

---

9. The only significant difference between the Nevada-side complaint and the California-side complaint is that only the California-side complaint alleges an equal protection violation.

the California side as a denial of equal protection; the essence of the complaint is that California property owners may be denied permission to develop their property, while Nevada property owners with the same IPES score may be granted development permits.

After the cases were consolidated in the Eastern District of California, the district court granted the Agency's motion to dismiss. It considered the three groups of plaintiffs separately: property owners in a SEZ, property owners below the IPES Line, and the 10% Plaintiffs challenging the scheme of mitigation conditions. The court found that any takings claim asserted by the SEZ plaintiffs accrued in 1989, when they were notified that their land was classified as a SEZ, and therefore not capable of development. Similarly, the court found that takings claims asserted by property owners below the IPES Line accrued in 1990, when the vacant lot equation preventing IPES Line movement was calculated for the first time. The court found that the equation and other criteria for lowering the IPES Line were fixed as of 1990, and that the 1999 Agency decisions regarding the IPES Line did not retrigger the statute of limitations. Because the complaints were filed in 2000, but complained of injuries that the plaintiffs should have recognized at the latest in 1990, the court found them barred by the statute of limitations.

The district court also determined that the takings claims of the 10% Plaintiffs were barred, or, alternatively, unripe. A facial exactions challenge to the 1987 Plan would have accrued when the 1987 Plan was enacted, and was therefore barred by the statute of limitations. In contrast, an as-applied challenge to the mitigation program required the plaintiffs to attempt to take advantage of the mitigation procedures. As no plaintiff had alleged an effort to do so, the court held that the 10%

Plaintiffs' as-applied claims were not ripe for review.

Finally, the district court dismissed the equal protection challenge as time-barred, because the cause of action accrued when the regulation containing the allegedly unconstitutionally unequal provisions was enacted. Because the plaintiffs knew in 1987 that the Agency would treat plots with identical IPES scores differently depending on the state in which they were located, the district court found that the statute of limitations had run.

The district court dismissed the claims in July of 2000. This timely appeal followed.

## III. DISCUSSION

We agree with the district court that the plaintiffs' opportunity to litigate most of the claims at issue here passed long ago. Although the Association attempts to frame its complaint in terms of new injuries caused by new acts, this action is in reality a prayer for relief from wrongs allegedly done by the Agency in connection with actions it took to implement the 1987 Plan during the period from 1987 through 1991. We have addressed many of these allegations before, when we considered the Association's 1991 and 1992 amended complaints (collectively, "the 1991 complaints") attacking the 1987 Plan. We acknowledge, however, that one set of claims, asserted by the 10% Plaintiffs, alleges harm that has not yet been done; we analyze these unripe allegations in section III.B., *infra.* As for the remaining claims, to the extent that they do not duplicate claims resolved in the *Tahoe III* and *Tahoe IV* opinions, we find that they could and should have been raised in the earlier amended complaints, and are therefore precluded by the doctrine of res judicata.

 Although the district court did not reach the issue of claim preclusion, "[w]e

may affirm the district court on any ground supported by the record, even if the ground is not relied on by the district court." *Aetna Life Ins. Co. v. Bayona,* 223 F.3d 1030, 1034 n. 4 (9th Cir.2000) (internal quotation marks omitted); *see also Dittman v. California,* 191 F.3d 1020, 1027 n. 3 (9th Cir.1999) (declining to address the district court's statute of limitations analysis, and instead affirming on different grounds). Because the facts giving rise to res judicata are amply supported by the record on appeal, we hold that the Association's claims (except for the as-applied claims asserted by the 10% Plaintiffs) are barred by the doctrine of res judicata, and affirm the judgment of the district court. As to the 10% Plaintiffs' as-applied claims, we affirm their dismissal as well, but on ripeness grounds. Accordingly, we express no view as to the statute of limitations arguments on which the district court based much of its ruling.

## A. Res Judicata

■ After eighteen years of litigation, ten years of which has been devoted to adjudicating harm allegedly done by the 1987 Plan and its implementation, the final judgments of *Tahoe III* and *Tahoe IV* should finally rest in peace. We steadfastly protect a litigant's right to his day in court. Once a sophisticated party has had a full and fair opportunity to be heard, however, we also recognize the merits of finality:

> The doctrine of *res judicata* provides that 'a final judgment on the merits bars further claims by parties or their privies based on the same cause of action.' The application of this doctrine is 'central to the purpose for which civil courts have been established, the conclusive resolu-

tion of disputes within their jurisdiction.' Moreover, a rule precluding parties from the contestation of matters already fully and fairly litigated 'conserves judicial resources' and 'fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.'

*In re Schimmels,* 127 F.3d 875, 881 (9th Cir.1997) (quoting *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)); *see also Bell v. United States,* 2002 WL 1987395, at *4 (E.D.Cal.2002) ("The doctrine of res judicata is meant to protect parties against being harassed by repetitive actions."); *Clements v. Airport Auth.,* 69 F.3d 321, 330 (9th Cir.1995) ("Preclusion doctrine encompasses vindication of both public and private interests. The private values protected include shielding litigants from the burden of re-litigating identical issues with the same party, and vindicating private parties' interest in repose. The public interests served include avoiding inconsistent results and preserving judicial economy.").

■ Three elements constitute a successful res judicata defense.[10] "Res judicata is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties." *Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.,* 298 F.3d 1137, 1143 n. 3 (9th Cir.2002) (citing *Owens v. Kaiser Found. Health Plan, Inc.,* 244 F.3d 708, 713 (9th Cir.2001)).

### 1. Identity of Claims

■ The fact that res judicata depends on an "identity of claims" does not mean that an imaginative attorney may avoid preclusion by attaching a different legal label to an issue that has, or could

---

**10.** Because we analyze whether the federal *Tahoe III* and *Tahoe IV* litigation precludes the Association's current claims, we apply the federal law of claim preclusion. *See, e.g.,* *Western Systems, Inc. v. Ulloa,* 958 F.2d 864, 871 n. 11 (9th Cir.1992) ("The res judicata effect of federal court judgments is a matter of federal law.").

have, been litigated. Rather, "[i]dentity of claims exists when two suits arise from 'the same transactional nucleus of facts.'" *Id.* (quoting *Owens,* 244 F.3d at 714). Newly articulated claims based on the same nucleus of facts may still be subject to a res judicata finding if the claims could have been brought in the earlier action. As we stated in *United States ex rel. Barajas v. Northrop Corp.,* 147 F.3d 905 (9th Cir.1998):

> Res judicata bars relitigation of all grounds of recovery that were asserted, or could have been asserted, in a previous action between the parties, where the previous action was resolved on the merits. It is immaterial whether the claims asserted subsequent to the judgment were actually pursued in the action that led to the judgment; rather, the relevant inquiry is whether they could have been brought.

*Id.* at 909 (citations omitted).

Here, the relevant "transactional nucleus of facts" governing the claims that could have been brought encompasses the enactment of the 1987 Plan and its application to the plaintiffs' properties. In 1991 and 1992, the Association amended its complaints (collectively, "the 1991 complaints") to challenge the Agency's application of the 1987 Plan. In that earlier litigation, the Association protested the Agency's "outright prohibitions on use of SEZ lots," "the prohibition on use" of other properties below the IPES "pass/fail" line, and the failure of the Agency to lower the IPES Line in a timely manner—all pursuant to the

1987 Plan.[11] *See* First Am. Compl. at 43–44, *TSPC v. TRPA,* 808 F.Supp. 1484 (D.Nev.1992) (No. CVN 92–98–ECR); *see generally Tahoe III* and *Tahoe IV.*

Now, the Association has returned to court and filed a new action essentially seeking relief from the same alleged wrongs it unsuccessfully protested before. Once again, the plaintiffs ask for damages based on the same nucleus of facts—their inability to develop SEZ lots, their inability to develop lots below the IPES "pass/fail" line, and the alleged failure of the Agency to lower the IPES Line in a timely manner. These development moratoria and the criteria which govern any change in the moratoria were all established by the 1987 Plan and were unambiguously in force before the Association filed its first amended complaint in the former action. Any of the claims presently before us could thus have been asserted in the previous lawsuit.

The Association attempts to distinguish the claims contained in its new complaint by emphasizing the role of the 1999 meetings in which the Board "refused" to lower the IPES Line for 1999 and 2000, allegedly contrary to the Agency's initial representations. We first dispose of the Association's implication that any action taken by the Board in 1999 was contrary to a material representation. The plaintiffs' complaint itself shows that, if ever there were misstatements by the Agency regarding the consequences of the 1987 Plan, they were corrected long before 1999. At most, the Association alleges that the Agency in 1986

---

**11.** The 1991 complaints alleged that the 1987 Plan only "continued" the damage caused by Agency regulation in place since 1981. However, it is clear that in addition to claims for relief from pre–1987 regulation, the Association by amending its complaints also intended to assert specific claims resting on the distinct structure of the 1987 Plan's IPES system and the way in which it was applied. The 1987 Plan was sufficiently distinct from its prede-

cessors that it "could not be considered a continuation of the 1984 plan," *TSPC v. TRPA,* 808 F.Supp. at 1491; *see also Tahoe III Appeal,* 34 F.3d at 755. The Association's amendments—predicated on the structure and implementation of the 1987 Plan—were therefore not merely casual allegations of continuing wrong, but rather claims for relief based on a specific and distinct nucleus of facts.

misrepresented the time period within which the IPES Line would drop, by underestimating the number of parcels that had to be protected from development before the Line was eligible for adjustment. *See supra* note 6. As the Association admits in its present complaint, however, by 1990 the basic numerical elements of the "vacant lot equation" had been recalculated, and the consequence of that recalculation was "to make it virtually impossible for the Pass–Fail Line to move downward on the California-side of the Basin for many years." Moreover, the results of the recalculations were made fully available to all interested members of the public. Even if the declared factual basis for the estimated movement of the IPES Line misled the plaintiffs in 1986, that declared basis was corrected—and the Association was informed of the correction—by 1990, well before the Association amended its complaints in the prior action. Therefore, no action by the Board in 1999 was even colorably inconsistent with the understanding that the Association should have had *in 1990* as to how the system would function.

Moreover, any misestimation by the Agency regarding the time periods involved or the number of parcels that might meet various criteria of the Plan cannot serve to change the fact that the Plan's relevant legal and factual components were fixed in 1987 and were not modified after that date. It is those components that govern whether a taking occurred, not any non-binding estimates issued by the Agency for informational purposes, nor even any predictions as to how long it

might take for the objective criteria to be met.

■ Absent the misrepresentation issue, we are left with the allegation that the simple fact of the Board's "refusal" to lower the IPES Line at the 1999 meetings effects an unconstitutional taking. This "refusal" is alleged to constitute an act distinct from the transactional nucleus of facts at issue in the earlier litigation. The Association's artful drafting, however, cannot disguise the crux of the controversy. The 1987 Plan firmly established the criteria governing the Board's ability to lower the IPES Line. The Board was only permitted to lower the Line if certain triggering events occurred, including the attainment of predefined "vacant lot equation" levels. Its relevant actions at the 1999 meetings were nondiscretionary. The plaintiffs should have known *in 1987* that the Board would not be free to lower the IPES Line until the vacant lot equation reached 20% in California or 33% in Nevada. By 1990 at the latest, when each plaintiff had received his lot's IPES score and the total number of sensitive parcels had been firmly established, each plaintiff should have known that development would be banned on *his* particular property at least until the vacant lot equation permitted the Board to lower the IPES Line. The Board acted in 1999 precisely as it was required to act by the plain terms of the 1987 Plan—and the mere fact that it so acted in 1999 does not establish a new set of facts giving rise to a new legal claim.[12]

The Association also emphasizes that its current claim is an as-applied challenge to

---

**12.** At most, the 1999 decisions gave the plaintiffs incrementally more information about the extent of their alleged injury. The "refusals" to lower the IPES Line simply informed the plaintiffs of what the provisions of the 1987 Plan required—that development would be banned on their properties for one additional year. This information, however, is not

the sort of legally actionable "fact" giving rise to a new cause of action. It is more properly analogous to increased information regarding the extent of the damage caused by a particular injurious act. Under these circumstances, federal law does not recognize a cause of action to recover increased damages from an injury that has already been addressed by a

the 1999 "decisions," but the emphasis is meaningless under the circumstances of this case. Often, an as-applied challenge will not be precluded by an earlier facial challenge because the "transactional nucleus of facts" surrounding the enactment of a regulation will be different from the nucleus of facts involved when that regulation is applied to a particular property. For example, a regulatory body's discretionary decision to grant or refuse a variance might involve facts sufficiently different from those involved in enacting the governing regulations to support a new legal claim. In this case, however, no new facts relevant to any cause of action against the Agency arose in 1999; the 1999 "decisions" complained of were non-discretionary, and were mandated by external criteria that were established years before and were beyond its control.[13] The facts relevant to the claims at issue here—the structure of the 1987 Plan and the manner

in which it would be applied—were all evident by 1990.[14]

Indeed, in its 1991 complaints, the Association protested both the enactment of the 1987 Plan and its implementation. It even described the specific effect of the 1987 Plan on each of its members involved in the suit. Because, under the Plan, the Agency could not in 1999 alter the IPES Line without finding that the external criteria satisfied a formula established in the 1987 Plan, it performed no discretionary function in that year. The Association's present complaint is actually addressed to the formula established in 1987; the Agency has taken no new discretionary action pursuant to this formula following the filing of the 1991 action. Thus, the conduct now alleged to cause harm involves the same nucleus of facts addressed in the 1991 complaints, and any claim concerning that conduct could have been brought in the prior action.[15]

final judgment. *See* RESTATEMENT(SECOND) OF JUDGMENTS § 5 cmt. c (1982) ("[I]f a plaintiff who has recovered a judgment against a defendant ... commences a second action to obtain increased damages, the court will hold him precluded; his claim has been merged in the judgment and may not be split. It is immaterial that in trying the first action he was not in possession of enough information about the damages, past or prospective, or that the damages turned out in fact to be unexpectedly large and in excess of the judgment.").

13. We do not suggest that the Basin's development scheme was irrevocably fixed as of 1987. Although the critical factor under the 1987 Plan—the proportion of lots that have been permanently protected from future development—is dependent upon circumstances over which the Agency has no control, although the Agency has no discretion under the 1987 Plan to change the threshold proportion of lots permitting movement of the IPES Line, and although the Agency has no discretion under the Plan to change *which* factors trigger its ability to lower the Line, the Agency at all times retained the power to issue a

completely new Plan governing development in the Basin. Whether a new Plan would constitute a new "transactional nucleus of facts," and permit the filing of a new lawsuit, is a hypothetical question we do not consider here.

14. In contrast, the 10% Plaintiffs were and are still subject to Agency discretion. Because their as-applied claims may not depend on the same transactional nucleus of facts as that which established the 1987 Plan, we do not include these claims among those barred by res judicata. *See* section III.B., *infra*.

15. The Association now alleges an equal protection claim that also could have been brought in the prior litigation. It claims that the Agency treated California and Nevada parcels impermissibly differently by lowering the IPES Line more quickly in one jurisdiction than the other. As the district court recognized, this is essentially a facial challenge to the inherently unequal criteria for moving the IPES Line contained in the 1987 Plan. The 1987 Plan enshrined the differential triggering requirements for the vacant lot equations of California and Nevada; the

In one telling passage of its current complaint, the Association admits as much. This lawsuit was filed while *Tahoe IV* was still pending before this court, and the Association was concerned about the impact of both lawsuits proceeding concurrently. The current complaint states that if the prior lawsuit were allowed to go forward, it would "likely be necessary to amend this Complaint so as to avoid having duplicative actions then pending as to the same facts and issues." The fact that *Tahoe IV* was ultimately dismissed makes this action no less duplicative. We find that the claims asserted here arise from the same transactional nucleus of facts as those asserted in *Tahoe III* and *Tahoe IV*, and therefore find an identity of claims in this lawsuit and the Association's prior actions.

## 2. Final Judgment on the Merits

■ Res judicata also requires a final judgment on the merits. There was clearly such a final judgment here. The district court in *TSPC v. TRPA*, 992 F.Supp. at 1221, dismissed the Association's claims relating to the 1987 Plan as barred by the statute of limitations. This court affirmed. *Tahoe IV Appeal*, 216 F.3d at 789. The Supreme Court has unambiguously stated that a dismissal on statute of limitations grounds is a judgment on the merits. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 228, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). We therefore find that the Association's former suit was resolved by a final judgment on the merits.

## 3. Privity Between the Parties

■ The final element of res judicata is privity between the parties. We first note that several parties in both actions are identical, and therefore quite obviously in privity. Thirty-three of the individual California-side plaintiffs and three of the individual Nevada-side plaintiffs were also named plaintiffs in the earlier *Tahoe* actions. There can be no question that these parties already had a complete opportunity to litigate their claims. Similarly, the Association—the lead plaintiff in both the prior lawsuit and the current action—is unequivocally bound by its own judgment in the former suit.

■ Even when the parties are not identical, privity may exist if "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest." *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir.1983) (citation omitted); *see also Stratosphere Litigation*, 298 F.3d at 1142 n. 3 (finding privity when a party is "so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved") (citation omitted); *Shaw v. Hahn*, 56 F.3d 1128, 1131–32 (9th Cir.1995) (finding privity when the interests of the party in the subsequent action were shared with and adequately represented by the party in the former action); *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980) ("[A] 'privy' may include those whose interests are represented by one with authority to do so."). We made clear, in *In re Schimmels*, that privity is a flexible concept dependent on the particular rela-

---

Agency had no discretion to deviate from the Plan's provisions. In 1999, the Agency did not apply equal terms unequally—it applied inherently *unequal* terms in equal fashion. If the Association thought the inequality unlawful, its quarrel was with the terms of the 1987 Plan itself. *Cf. Levald, Inc. v. City of Palm*

*Desert*, 998 F.2d 680, 689 (9th Cir.1993) (finding an alleged as-applied challenge more properly expressed as a facial challenge). Because the inequality was apparent in 1987, when the plan was adopted, this claim could and should have been brought in the plaintiffs' prior lawsuit.

tionship between the parties in each individual set of cases:

> Federal courts have deemed several relationships "sufficiently close" to justify a finding of "privity" and, therefore, preclusion under the doctrine of *res judicata:* "First, a non-party who has succeeded to a party's interest in property is bound by any prior judgment against the party. Second, a non-party who controlled the original suit will be bound by the resulting judgment. Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." In addition, "privity" has been found where there is a "substantial identity" between the party and nonparty, where the nonparty "had a significant interest and participated in the prior action," and where the interests of the nonparty and party are "so closely aligned as to be virtually representative." Finally, a relationship of privity can be said to exist when there is an "express or implied legal relationship by which parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues."

*Schimmels,* 127 F.3d at 881 (citations omitted); *see also Richards v. Jefferson County,* 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996) ("Moreover, although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."); *Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.,* 876 F.2d 266, 270 (2d Cir.1989) ("The issue is one of substance rather than the names in the caption of the case; the inquiry is not limited to a traditional privity analysis."); *ITT Rayonier,* 627 F.2d at 1003 ("Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying collateral estoppel or res judicata.").

■■■ One of the relationships that has been deemed "sufficiently close" to justify a finding of privity is that of an organization or unincorporated association filing suit on behalf of its members. *See, e.g.,* 18A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4456 (2002) [hereinafter WRIGHT & MILLER] (cataloguing cases). Of course, the organization must adequately represent the interests of its individual members if its representation is to satisfy the due process concerns articulated in *Hansberry v. Lee,* 311 U.S. 32, 40–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940). *See, e.g., Pedrina v. Chun,* 97 F.3d 1296, 1302 (9th Cir.1996). However, if there is no conflict between the organization and its members, and if the organization provides adequate representation on its members' behalf, individual members not named in a lawsuit *may* be bound by the judgment won or lost by their organization. A finding of privity in such circumstances is particularly appropriate in cases involving interests in real property, for, as the Supreme Court has recognized, "[t]he policies advanced by the doctrine of *res judicata* perhaps are at their zenith in cases concerning real property, land and water." *Nevada v. United States,* 463 U.S. 110, 129 n. 10, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).

■■■ In this case, all of the remaining individual plaintiffs are members of the Association, and given the history and nature of this litigation, their membership in and close relationship with the Association is sufficient to bind them as parties in privity for res judicata purposes. In both the earlier suit and the current action, the individual plaintiffs clearly hitched their fortunes to the Association's able leader-

ship. The Association's own description of its role is most telling:[16]

> Plaintiff TAHOE–SIERRA PRESERVATION COUNCIL, INC .... is a membership organization representing approximately 2,000 dues-paying members who own private real properties, both improved and unimproved, located in the Lake Tahoe Basin, which real properties are subject to the planning and regulatory jurisdiction of Defendant TRPA. The principal purpose of the PRESERVATION COUNCIL is to actively represent the interests of its members, individually and collectively, before the TRPA and other regulatory agencies in connection with its members' use and enjoyment of their private properties located in the Lake Tahoe Basin. All of the PRESERVATION COUNCIL'S members owning real property in the Lake Tahoe Basin have a direct interest in the planning and regulatory activities of TRPA, and particularly in the specific provisions of the TRPA regulations complained of herein....

> Among the PRESERVATION COUNCIL'S members are each of the named-Plaintiffs joining in this action.... .

We conclude that in these circumstances, the Association represented the interests of its member property owners sufficiently thoroughly to bind other members alleging similar wrongs arising from the same set of facts.[17] In its capacity as guardian and protector of the interests of the property owners of the Tahoe Basin, the Association had the authority to bring claims "on behalf of its members[,] including the named Plaintiffs" in both actions. Moreover, it defended its members' interests vigorously, through at least 18 years of litigation on this matter alone. There is no suggestion of any conflict between the Association and any of its members concerning the implementation of the 1987 Plan that might otherwise counsel against a finding of adequate representation, and when res judicata was asserted in the district court, no current plaintiff alleged that he was in a legal position different from either the Association or the individual named plaintiffs in the earlier litigation.[18]

**16.** This description appears in the Association's current complaint. The Association's description of itself in its prior complaint was virtually identical.

**17.** The record does not disclose whether the properties represented in the first action are precisely the same properties as those represented in the second action. However, the properties are all similarly situated with respect to the Agency's alleged wrong in improperly implementing the IPES System. *See Pedrina*, 97 F.3d at 1302 (finding privity when the plaintiff tenants were "all similarly situated and their interests were given due consideration in the earlier proceedings" despite the fact that not all tenants joined the earlier action); *Ellentuck v. Klein*, 570 F.2d 414, 425–26 (2d Cir.1978) (finding privity when a property owners' association represented different sets of plaintiffs in the same essential dispute). No individual plaintiff claims that the 1987 Plan was differentially applied to his property; rather, all claims of unfair implementation concern alleged inequalities in the *structure* of the Plan itself. Because the only

as-applied claims properly before this court concern the uniform implementation of the plain terms of the 1987 Plan, the current plaintiffs are situated similarly to the plaintiffs in the former action.

**18.** Indeed, while neither party sought certification of a class in this case, the posture of the case substantially resembles an action for damages on behalf of the class of plaintiffs owning properties below the IPES Line. We do not intend to suggest that class certification either would or would not have been appropriate in this case. However, we note that binding current members of an association to the results of prior litigation conducted by that association is considered especially appropriate when the litigation resembles a class action in substance, if not in form. *See, e.g., Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276–80 (9th Cir.1991) (finding nonparties bound in privity because their interests were represented by the class certified in the case despite the fact that they were not actually members of the class); *Jackson v. Haya-*

We therefore conclude that the interests of the individual Association members were adequately represented in the prior litigation by the Association, the same organization that they have chosen as their current lead plaintiff.

Allowing the earlier litigation to bind the current plaintiffs is especially appropriate in light of the only available alternative here. The Association vigorously litigated the prior action on its members' behalf. Now that a final judgment has issued, it "should not be able to evade preclusion continually by averring that unidentified members are not bound and bringing successive suits by claiming injury to different identified members." 18A WRIGHT & MILLER § 4456. If the individual members of the Association were not bound by the result of the former litigation, the organization would be free to attack the judgment *ad infinitum* by arranging for successive actions by different sets of individual member plaintiffs, leaving the Agency's capacity to regulate the Tahoe properties perpetually in flux. *Cf. Alpert's Newspaper Delivery Inc.*, 876 F.2d at 270 (finding privity even when the association was not itself a party, but provided substantial "tactical and financial help" to the parties in both actions). The Association may not avoid the effect of a final judgment in this fashion.

 Because we find an identity of claims in the prior action resolved by *Tahoe III* and *Tahoe IV* and in the current complaint, because the prior action was resolved by a final judgment on the merits,

and because there was sufficient privity between parties to bind the current parties to the result of the prior litigation, we hold that the plaintiffs claims are barred by the doctrine of res judicata.

**B. 10% Plaintiffs**

 Certain plaintiffs—the "10% Plaintiffs"—also contest the feature of the 1987 Plan allowing property owners with IPES scores within 10% of the IPES Line to pursue water quality mitigation projects or pay mitigation fees in order to increase their parcel's IPES score above the threshold for joining the development permit pool. To the extent that these claims are construed as efforts to challenge the structure of the mitigation program itself, or its allegedly unconstitutional relationship to the development moratorium, they would properly be designated as facial challenges. Such facial challenges would have accrued the moment the plaintiffs became affected by the program—that is, the moment the plaintiffs became eligible to take advantage of the program provisions. *See Suitum v. TRPA*, 520 U.S. 725, 736 n. 10, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997) (discussing the accrual of facial challenges to regulatory ordinances); *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir.1993) (same). Because the mitigation program was an original feature of the 1987 Plan, it was fully in force, at the latest, as of 1990. As such, it could have been challenged in the same action as the remainder of the challenges to the 1987 Plan, described above.[19] For the same reasons described at length in sec-

---

*kawa*, 605 F.2d 1121, 1126 (9th Cir.1979) (finding nonparties bound in privity because the earlier case was "treated by the court as a class action," though it was never certified as such); 18A WRIGHT & MILLER § 4456 ("[Preclusion] may follow from litigation that is not formally designated as a class action, but that is treated as an action by or against all members as represented by the designated parties.").

19. According to the Association's brief, the mitigation provisions affecting the 10% Plaintiffs are now applicable only on the California side of the border. These 10% Plaintiffs have standing to bring a facial challenge because they own property with IPES scores within ten percent of the IPES Line; in California, the IPES Line has remained fixed since it was first calculated in 1988, and individual property owners all knew their IPES scores by 1990. Thus, any 10% Plaintiff with standing

tion III.A., *supra*, such facial challenges are now barred by the doctrine of res judicata.

If the claims of the 10% Plaintiffs are instead construed to be as-applied challenges, they are not, as we explain *infra*, subject to res judicata because they could not have been brought in the *Tahoe III* and *Tahoe IV* litigation. However, for the same reason that the claims could not properly have been brought at that time, we affirm the district court's conclusion that the claims are not yet ripe.

 The 10% Plaintiffs devote substantial portions of their brief to the constitutional implications of the 1987 Plan's mitigation provisions. They contend that the provisions constitute unconstitutional exactions of the type rejected by *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). These claims are only saved from preclusion if they are construed to be as-applied challenges to the mitigation program—claims that the mitigation program is unconstitutional as applied to individual plaintiffs' parcels. Yet the complaint does not allege that any 10% Plaintiff has yet attempted to pursue the terms of the mitigation program, or that the Agency has made an individual determination as to the mitigation applicable to that plaintiff's particular parcel. Without an ability to evaluate what the Agency intends to exact, we cannot determine if an alleged exaction is unconstitutional as applied.

The Association cites *Suitum v. TRPA*, 520 U.S. 725, 117 S.Ct. 1659, 137 L.Ed.2d 980 (1997), another case involving the Tahoe Basin, as support for the proposition that its claims are now ripe. In fact, *Suitum* compels precisely the opposite conclusion. In a comprehensive survey of the doctrinal line following *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court clearly explained that a regulatory takings claim is only ripe if the plaintiff "demonstrate[s] that she has both received a 'final decision regarding the application of the [challenged] regulations to the property at issue' from 'the government entity charged with implementing the regulations,' and sought 'compensation through the procedures the State has provided for doing so.'" *Suitum*, 520 U.S. at 734, 117 S.Ct. 1659 (quoting *Williamson County*, 473 U.S. at 186, 194, 105 S.Ct. 3108). The 10% Plaintiffs have not satisfied the first requirement.[20] No 10% Plaintiff has alleged that he has applied to take advantage of

---

to mount a facial challenge today either had standing to bring such a challenge in 1990 or is in privity with a former property owner who had such standing.

20. In *Suitum*, the Supreme Court did not decide whether the plaintiffs had satisfied Williamson County's second requirement:

Ordinarily, a plaintiff must seek compensation through state inverse condemnation proceedings before initiating a takings suit in federal court, unless the State does not provide adequate remedies for obtaining compensation. [Plaintiff's] counsel stated at oral argument that "the position of the Tahoe Regional Planning Agency is that they do not … have provisions for paying just compensation," thus suggesting that the agency is not subject to inverse condemnation proceedings, and the agency's counsel did not disagree. [The plaintiff's] position therefore appears to be that the sole remedy against the agency for a taking without just compensation is a § 1983 suit for damages, such as she has brought here. We leave this matter to the Court of Appeals on remand.

*Suitum*, 520 U.S. at 734 n. 8, 117 S.Ct. 1659.
 Because we find that the 10% Plaintiffs have not yet satisfied *Williamson County's* first requirement, we need not address what further action, if any, the 10% Plaintiffs must take to satisfy the second requirement.

the mitigation program, that a final decision applying the mitigation program to his particular property has been made, or that an application to reach such a final decision would be futile. The prerequisites are clear, and there is no allegation that they have been met.

The *Suitum* Court's *rationale*, which ties ripeness to the lack of residual discretionary authority of the regulatory decisionmaker, also indicates that the 10% Plaintiffs' as-applied claims are not yet ripe. In *Suitum*, the Agency had already applied its regulations to Suitum's parcel and had definitively precluded that parcel from all development. *Suitum*, 520 U.S. at 730–32, 117 S.Ct. 1659. The only action remaining for the Agency was the nondiscretionary transfer of certain "transferable development rights" to Suitum. *Id.* The Court carefully distinguished Suitum's claims, which were not subject to any further discretionary decision, from the unripe claims of plaintiffs in the *Williamson County* line, whose "particular lot[s] of land ... [are] subject to the decision of a regulatory body invested with great discretion, which it has not yet even been asked to exercise." *Id.* at 739–40, 117 S.Ct. 1659. Here, the Agency has "great discretion" in determining the impact of proposed mitigation projects and adjusting the IPES score of individual parcels accordingly. No plaintiff has yet asked it to exercise this discretion. We therefore hold that the as-applied claims of the 10% Plaintiffs are not yet ripe.

## IV. CONCLUSION

The Association had a full opportunity to contest the provisions of the 1987 Plan, and the manner of its implementation, in the litigation resolved by *Tahoe III* and *Tahoe IV*. Because the instant litigation involves claims arising from the same transactional nucleus of facts brought by parties in privity with the prior litigants, we hold that res judicata bars all of the claims other than the as-applied claims of the 10% Plaintiffs. As for the 10% Plaintiffs, because no 10% Plaintiff has requested application of the 1987 Plan's mitigation program to his particular parcel, these as-applied claims are not yet ripe. The district court did not err in dismissing the action. We therefore

**AFFIRM.**